# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| KELLEY DENICE VAUGHN,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 5:20-cv-02868<br><br>DISTRICT JUDGE JOHN R. ADAMS<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Kelley Denice Vaughn ("Plaintiff" or "Ms. Vaughn") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge pursuant to Local Rule 72.2.  For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.  Procedural History

On September 7, 2018, Ms. Vaughn filed applications for SSI and DIB, alleging a disability onset date of October 13, 2017.  (Tr. 67, 164-65, 290-91.)  She asserted that she was disabled due to asthma, fibromyalgia, pain, anxiety, depression, memory problems, vertigo, scoliosis, migraines, and fatigue.  (Tr. 128, 167, 209, 225, 316.)  Her applications were denied at the initial level (Tr. 208-22) and upon reconsideration (Tr. 225-36).  She then requested a

hearing.  (Tr. 237-38.)  On February 27, 2020, a hearing was held before an Administrative Law

Judge ("ALJ").  (Tr. 94-122.)

On March 19, 2020, the ALJ issued an unfavorable decision, finding Ms. Vaughn had not

been under a disability from October 13, 2017 through the date of the decision.  (Tr. 64-87.)  Ms.

Vaughn requested review of the decision by the Appeals Council. (Tr. 286-88.)  On October 29,

2020, the Appeals Council denied Ms. Vaughn's request for review, making the ALJ's decision

the final decision of the Commissioner.  (Tr. 1-7.)

## II. Evidence

Although Ms. Vaughn has multiple severe physical and mental impairments that were

identified by the ALJ (*see* Tr. 70), her challenge in this appeal relates to her asthma and, more

particularly, the ALJ's evaluation of the opinion of her treating allergist/immunologist Ravi

Karnani, M.D.  (ECF Doc. 13 pp. 11-24; ECF Doc. 16.)  The evidence summarized herein is

accordingly focused on evidence pertaining to Ms. Vaughn's asthma and related limitations.

### A.  Personal, Educational, and Vocational Evidence

Ms. Vaughn was born in 1970.  (Tr. 80, 100.)  She was living with her sister at the time

of the February 2020 hearing.  (Tr. 100, 111.)  She has a high school education and last worked

in October 2017 performing clerical work.  (Tr. 69-70, 80, 102-03, 317-18.)

### B.  Medical Evidence

#### 1.  Treatment History

Ms. Vaughn's primary care physician Franciska Kiraly, M.D. of Summa Physicians, Inc.,

Portage Lakes Internal Medicine ordered a chest x-ray on February 21, 2017 for Ms. Vaughn due

to a cough.  (Tr. 640, 773, 821-22.)  The x-ray showed her lungs were clear with no acute

infiltrate or effusion.  (Tr. 822.)

2

During a visit with Dr. Kiraly on November 15, 2017, for follow up regarding fibromyalgia pain and medication refills, Ms. Vaughn denied a cough or shortness of breath, her pulmonary/chest examination was normal for effort, and she was in no respiratory distress.  (Tr. 773, 776.)

On December 29, 2017, Ms. Vaughn visited the Summa Health Barberton Hospital emergency room, complaining of nasal congestion, sneezing, itchy eyes, and wheezing.  (Tr. 602.)  She reported using Claritin-D, pro-air MDI, and Flonase for her symptoms but she had missed multiple doses of her allergy shots because she was in the process of switching to a new allergist, Dr. Karnani.  (*Id*.)  She requested that the hospital administer her allergy shots using the open vials of medicine she brought with her.  (*Id*.)  She reported that her allergies were not bothering her too much that day.  (*Id*.)  On examination, she had a runny nose and tearing but normal lung sounds, no respiratory distress, wheezes, or rales and her pulse oximetry reading was 97%.  (Tr. 604-05, 610.)  She was discharged in stable condition with a diagnosis of seasonal allergies.  (Tr. 605.)  She was instructed to follow up with her primary care physician and Dr. Karnani for her allergy shots, or to self-administer them, since the hospital would not dispense medication from an open vial brought from home.  (Tr. 605, 611.)

Ms. Vaughn met with her new allergist/immunologist Dr. Ravi Karnani, M.D. of Akron Children's Hospital on January 5, 2018.  (Tr. 872-74, 1256.)  She reported receiving allergy shots for at least twenty years, which had helped, and also reported having an inhaler.  (Tr. 872.)  She stated that her usual symptoms were nasal congestion, drainage, sneezing, and "PND."  (*Id*.)  Although the treatment record does not include details regarding the meaning of "PND," Plaintiff states in her brief that it means nocturnal choking (ECF Doc. 13 pp. 4-5.)  She stated that her symptoms occurred year-round and were the worst during the winter.  (*Id*.)  She also reported

having lower respiratory problems at times with a wet cough, upper respiratory infections with wheezing, sinusitis once or twice each year for which antibiotics are prescribed, and was hospitalized about ten years earlier for a lower respiratory tract infection.  (*Id*.)  She reported walking often.  (*Id*.)  Examination findings were unremarkable.  (Tr. 873.)  She was diagnosed with chronic allergic rhinitis due to other allergic trigger, unspecified seasonality and wheeze.  (*Id*.)  Dr. Karnani recommended the following medications: Loratadine/Claritin-D, Prednisone, Albuterol/Proair/Ventolin as needed for rescue with increased coughing, wheezing, or shortness of breath, Flovent, and continuation of Ms. Vaughn's former allergist's allergy shot regimen until she transitioned to a new shot regimen.  (*Id*.)

During a follow-up appointment with Dr. Kiraly on February 15, 2018 for fibromyalgia, Ms. Vaughn complained of insomnia and chronic pain.  (Tr. 782.)  She denied congestion, postnasal drip, coughing, and shortness of breath.  (Tr. 782, 784.)  On examination, she displayed normal pulmonary effort and breath sounds, no respiratory distress, no wheezes, and no rales.  (Tr. 785.)

During early- and mid-March 2018 appointments with gastroenterologist Ghulam Mir, M.D. at Digestive Wellness Center (Tr. 854-57) and pain management specialist Guang Yang, M.D. at Comprehensive Pain Management Specialists (Tr. 689-94), Ms. Vaughn denied respiratory problems (Tr. 690), denied chest pain (Tr. 854) and physical examinations revealed non-labored breathing (Tr. 690) and normal pulmonary/chest sounds (Tr. 856).   In late-March 2018, however, Ms. Vaughn returned to Dr. Kiraly, complaining of sinus congestion, drainage, chest congestion, and a cough that had been ongoing for about a week.  (Tr. 792-93.)  She also reported she had received treatment at an express care about four weeks earlier for an upper respiratory infection which had resolved with medication, including antibiotics.  (Tr. 793.)   On

4

examination, Dr. Kiraly observed a normal pulmonary/chest effort and breath sounds, no respiratory distress, no wheezes, and no rales.  (Tr. 796.)  Ms. Vaughn was diagnosed with acute non-recurrent maxillary sinusitis and was prescribed an antibiotic medication along with an expectorant.  (*Id*.)

During April and June 2018 pain management visits at Comprehensive Pain Management Specialists, Ms. Vaughn denied respiratory problems (Tr. 680, 686) and physical examinations showed non-labored breathing (Tr. 680, 685) and no audible wheezing (Tr. 680).  Also, during an annual visit with Dr. Kiraly in April 2018, Ms. Vaughn did not complain of cough or shortness of breath and her pulmonary/chest examination was normal.  (Tr. 802, 804, 805.)  During May and June 2018 visits with Benjamin Burkam, M.D. at Summa Physicians, Orthopedic and Sports Medicine Summa Health Center regarding hip pain, pulmonary/chest examinations revealed normal effort.  (Tr. 928, 939.)

Ms. Vaughn returned to Dr. Karnani on July 12, 2018, complaining of coughing, wheezing, chest congestion, and itchy nasal congestion.  (Tr. 874.)  She reported having more issues that summer, noting daily wheezing, shortness of breath at times, and use of Albuterol two to three times each day.  (*Id*.)  She indicated that her nose was stuffy and runny at times and there was also blockage at times and her sense of smell was down.  (*Id*.)  She also reported that she did "not have worsening acutely with an allergy shot[].  Sleep affect, nocturnal cough, wheeze.  Exertion also harder."  (*Id*.)  Although her examination was clear, she was given Albuterol 0.083% and Prednisone 30 mg due to wheezing and mild chest tightness and her condition improved.  (Tr. 875.)  She was diagnosed with moderate persistent asthma without complication and wheeze.  (*Id*.)

During a July 31, 2018 visit with Dr. Kiraly for her fibromyalgia, medication refills, and anxiety, Ms. Vaughn was negative for chest pain, congestion, shortness of breath, sinus pain or pressure, sneezing, and cough.  (Tr. 812, 814.)  Her pulmonary/chest examination showed normal effort and no respiratory distress.  (Tr. 815.)

Ms. Vaughn returned to Dr. Karnani on August 14, 2018, reporting fluctuating symptoms of wheezing, coughing, and shortness of breath and some sinus symptoms, including a stuffy nose.  (Tr. 877.)  She reported using Albuterol two to three times each day, which helped.  (*Id*.)  She also reported that Prednisone helped, but that she was not near baseline.  (*Id*.)  She stated that exertion could bring on a cough and dyspnea, but she remained active as best she could.  (*Id*.)  Although her examination was clear, Dr. Karnani administered Duoneb and albuterol due to wheezing and mild chest tightness.  (Tr. 878.)  She was discharged home in good condition with a diagnosis of moderate persistent asthma without complication and prescriptions for Prednisone, Doxycycline, and a Symbicort inhaler in place of Flovent.  (*Id*.)  Dr. Karnani also prescribed a rescue inhaler, Loratadine/Claritin-D, and Albuterol nebulizer to be used as needed.  (*Id*.)   A chest x-ray ordered on August 20, 2018 by Dr. Karnani due to a cough showed hypoventilation but no acute pulmonary disease.  (Tr.  647, 1212.)

On September 20, 2018, Ms. Vaughn returned to Comprehensive Pain Management Specialists for pain treatment, seeing Sabrina Barros, PA-C.  (Tr. 883.)  She reported shortness of breath and asthma, but examination showed non-labored breathing and no audible wheezing.  (Tr. 884.)

During an October 26, 2018 visit with Blossom Heindel, D.O. at Summa Physicians, Orthopedic and Sports Medicine Summa Health Center for hip pain, Ms. Vaughn's pulmonary/chest examination showed normal effort and no respiratory distress.  (Tr. 947.)  A

few days later, Ms. Vaughn returned to see Dr. Kiraly concerning her hip pain.  (Tr. 1005-06.) She was negative for shortness of breath, coughing, chest pain, and palpitations at that visit, a pulmonary/chest examination showed normal effort and no respiratory distress, and her pulse oximetry reading was 97%.  (Tr. 1006, 1008-09.)

Ms. Vaughn returned to see Dr. Kiraly on December 10, 2018, complaining of a cough, congestion, drainage, wheezing, shortness of breath, and fever.  (Tr. 1014-15.)  She reported that her symptoms had been ongoing for the past four weeks and were gradually getting worse.  (Tr. 1015.)  She reported no aggravating factors and stated that cough syrup and Flonase had not helped.  (*Id*.)  There were no examination findings.  (Tr. 1017.)  Dr. Kiraly prescribed Prednisone, an antibiotic, and Fluconazole.  (Tr. 1017-18.)

On January 4, 2019, Ms. Vaughn called Dr. Karnani's office, complaining that for the prior two days she had been itchy throughout the day and covered in hives by later in the afternoon.  (Tr. 1153.)  She reported taking Benadryl and Tylenol with minimal relief.  (*Id*.)  Dr. Karnani phoned in a five-day Prednisone prescription and advised her to take Zyrtec for one week and use Benadryl only as needed due to the risk of sedation.  (Tr. 1154.)  Dr. Kiraly also indicated that she could continue to take Claritin-D, but again noted the potential sedation side effect associated with taking extra antihistamines.  (Tr. 1155.)   During an orthopedic follow up a few days later regarding her hip, she had normal pulmonary effort and no respiratory distress on examination.  (Tr. 1043.)

Ms. Vaughn returned to Dr. Karnani on January 17, 2019, reporting intense coughing, and wheezing with some shortness of breath that started about two or three weeks earlier as a head cold with stuffiness and drainage.  (Tr. 1150.)  She reported that her shortness of breath was not occurring daily, and she was able to sleep, but her cough and sinus congestion was worse.

(*Id*.)  She reported chest discomfort that was worse with arm movement and when she coughed, and said it was painful if she pressed on her chest.  (*Id*.)  She indicated that she was using Albuterol twice a day and it was helping.  (*Id*.)  She also reported that her allergy shots were going well and she felt she might be getting "a booster affect" from them, noting she was less stuffy a day or two after receiving a shot.  (*Id*.)  Examination findings were unremarkable.  (Tr. 1151.)  Ms. Vaughn was diagnosed with asthma exacerbation, chronic sinusitis, allergic rhinitis, and costochondritis.  (*Id*.)  Dr. Karnani prescribed Prednisone and an antibiotic, and continued to recommend that she use Symbicort daily, Loratadine/Claritin-D, a rescue inhaler, and an Albuterol nebulizer as needed.  (Tr. 1152.)

At a gastroenterology appointment with Ghulam Nabi Mir, M.D. at Gastroenterology Norton on February 4, 2019 for complaints of abdominal pain, Ms. Vaughn complained of wheezing, but her pulmonary/chest examination was normal.  (Tr. 1060.)  During a pain management visit the next day with PA Barros, Ms. Vaughn's breathing was non-labored and there was no audible wheezing noted.  (Tr. 1066.)

Ms. Vaughn spoke with Angela Chambers, RN at Dr. Karnani's office by telephone on March 25, 2019, reporting that she was sick, wheezing very bad, using inhalers and nebulizer without relief, having throat discomfort, and having some shortness of breath with discomfort. (Tr. 1159.)  Ms. Vaughn reported that her symptoms had been going on for four or five days, and she was seeking advice.  (*Id*.)  Nurse Chambers noted that she could hear the wheezing over the phone, and instructed Ms. Vaughn to go to the emergency room if there was no improvement. (*Id*.)  Ms. Vaughn indicated that she did not feel it was an emergency and reported no fever.  (Tr. 1159-60.)  Dr. Karnani was consulted and started her on Prednisone for five days, advised her to use Albuterol twice (back-to-back) with her nebulizer and then to use it every four hours, and to

report to the emergency room if she did not respond favorably that day or night to the recommended treatment.  (*Id*.)

Ms. Vaughn returned to Dr. Karnani on May 31, 2019, complaining of coughing, wheezing, chest tightness, and shortness of breath that had been ongoing for at least one month. (Tr. 1141.)  She reported using Albuterol daily, which helped for about four to six hours.  (*Id*.) She stated that her symptoms, especially her wheezing, were worse at night.  (*Id*.)  She reported getting an allergy shot the day before and was not worse.  (*Id*.)  She continued to report that she felt she might get "a booster affect" from her allergy shots because she was less stuffy for a day or two following her shots.  (*Id*.)  Examination findings were unremarkable and Dr. Karnani continued to diagnose asthma exacerbation, chronic sinusitis, allergic rhinitis, and costochondritis.  (Tr. 1142-43.)  Dr. Karnani prescribed Prednisone and an antibiotic.  (Tr. 1143.) He also ordered a chest x-ray, prescribed Singulair and Advair (in place of Symbicort) to be used on a regular basis, Loratadine/Claritin-D, a rescue inhaler, and Albuterol nebulizer as needed, and suggested a second opinion with a pulmonologist.  (*Id*.)

On June 6, 2019, Ms. Vaughn had a chest x-ray.  (Tr. 1216-17.)  It showed linear atelectasis of the right midlung field and biapical pleural thickening, but the impression was negative.  (Tr. 1217.)  On June 10, 2019, Dr. Karnani noted that Ms. Vaughn's chest x-ray was "clear or normal officially.  Good result."  (Tr. 1134-35.)  He recommended that she proceed with her appointment with pulmonologist Dr. Murray in July for an asthma second opinion.  (Tr. 1135.)

Ms. Vaughn saw pulmonologist Timothy C. Murray, M.D. on July 17, 2019 for a consultation and evaluation of dyspnea.  (Tr. 1168-74.)  She reported eight to nine months of shortness of breath that occurred mainly on exertion.  (Tr. 1168.)  She reported that she felt she

could not "draw a deep breath," as well as associated wheezing and a nonproductive cough with occasional phlegm.  (*Id*.)  She also reported being able to independently care for her hygiene, perform household chores, and climb twelve stairs one after the other with a need to stop at the top.  (*Id*.)  On pulmonary/chest examination, Dr. Murray noted: "increased AP dimension and thickness due to her size" and "perhaps diminished depth of breath."  (Tr. 1173.)  Otherwise, the pulmonary/chest examination findings were normal.  (*Id*.)  Dr. Murray reviewed past test results, noting "Spirometry: Performed 5/31/2019 is normal. FEV1 2.89 L at 91% of predicted and FVC 2.45 L at 86% of predicted."  (*Id*.)  Independent records of the spirometry test do not appear to be in the record.  Dr. Murray also noted that there were x-ray results but no images available for chest x-rays taken in August 2018 and June 2019.  (*Id*.)  Ms. Vaughn was diagnosed with shortness of breath, shortness of breath on exertion, and mild intermittent asthma (Tr. 1173-74.)  Dr. Murray noted that Ms. Vaughn's shortness of breath was not suggestive of typical asthma.  (*Id*.)  He ordered testing to further assess her shortness of breath and advised Ms. Vaughn to continue using Symbicort and Albuterol as necessary.  (*Id*.)

Ms. Vaughn returned to Dr. Kiraly on August 1, 2019 for medication refills.  (Tr. 1183-84.)  She denied chest pain, coughing, and shortness of breath.  (Tr. 1184, 1186.)  Pulmonary/chest examination was normal.  (Tr. 1187.)

During September, October, and November 2019 visits with Donald C. Perrine, M.D. at Summa Health regarding her hip pain, Ms. Vaughn's reviews of systems were positive for cough, shortness of breath, and wheezing, but no respiratory distress or wheezes were observed on examination.  (Tr. 1197, 1201, 1219-20, 1224, 1225, 1260-61, 1266, 1282-83, 1287, 1288.)

On November 14, 2019, Ms. Vaughn underwent pulmonary function testing ordered by Dr. Murray.  (Tr. 1233-41.)  The pulmonary function tests were within normal range with a mild defect in gas transfer and positive Methacholine Challenge.  (Tr. 1234.)

Ms. Vaughn returned to Dr. Karnani on January 3, 2020.  (Tr. 1243-45.)  She reported having nasal congestion, drainage, post-nasal drip, and ear fullness for three or four days, as well as a cough, wheezing, and mild dyspnea.  (Tr. 1243.)  She reported using her Albuterol nebulizer twice a day for the past two days.  (*Id*.)  She also reported interrupted sleep and tiredness, but no fever and an ability to perform her usual daily activities.  (*Id*.)  She reported that her allergy shots were going well, and that she still felt she received "a booster affect" from them.  (*Id*.)  Examination findings were unremarkable.  (Tr. 1244.)  Ms. Vaughn was diagnosed with moderate persistent asthma, seasonal allergic rhinitis due to pollen, and chronic sinusitis.  (*Id*.)  Dr. Karnani prescribed Prednisone and a cough medicine.  (Tr. 1245.)  He advised her to continue to take Singulair and use Symbicort until she had Advair "in hand."  (*Id*.)  Dr. Karnani also advised her to continue using Loratadine/Claritin-D, a rescue inhaler, and an Albuterol nebulizer as needed.  (*Id*.)  Dr. Karnani also noted that if she wanted to try Melatonin, she could start with 3 mg per night and build up to 10 mg per night.  (*Id*.)

On January 6, 2020, Ms. Vaughn's pharmacy reached out to Dr. Karnani, indicating that prior authorization was required for Advair.  (Tr. 1321-22.)  Dr. Karnani provided the following reason in support of the request for prior authorization:

> Reason: "Severe persistent asthma, prednisone courses required 6 times per year. We've tried Symbicort and Flovent with both suboptimal result. We are hoping to try the highest dose of Advair 230/21 to help achieve some form of asthma control. Please allow Advair 230/21." Let me know, appreciate your help, Ravi

(Tr. 1322.)  The request for Advair was approved on January 8, 2020.  (*Id*.)

On January 8, 2020, Ms. Vaughn called Dr. Karnani's office to cancel her shot for the following day, explaining to Jaclyn Warner, RN that she was still sick and had a few days of antibiotics left.  (Tr. 1324.)   Nurse Warner messaged Dr. Karnani, inquiring whether Ms. Vaughn needed more Prednisone.  (*Id.*)  Dr. Karnani agreed, extending Ms. Vaughn's Prednisone and switching her to a different antibiotic.  (Tr. 1324-25.)

Ms. Vaughn returned to Dr. Kiraly on February 4, 2002 for an annual exam.  (Tr. 1293-94.)  Her review of systems was positive for sinus pain but negative for congestion, post-nasal drip, runny nose, sinus pressure, cough, or shortness of breath.  (Tr. 1296.)  On examination, Dr. Kiraly noted a runny nose and moist mucous membranes, but normal pulmonary effort, no respiratory distress, normal breath sounds, no wheezing or rales, and a pulse oximetry reading of 97%.  (Tr. 1296-97.)

### 2.     Opinion Evidence

#### a.     Treating Allergist/Immunologist

On February 13, 2020, Ms. Vaughn's treating allergist/immunologist Ravi Karnani, M.D. completed a form titled "Off-Task / Absenteeism Questionnaire."  (Tr. 1256-58.)   Dr. Karnani opined that it was likely that Ms. Vaughn would be off-task at least twenty percent of the time due to the following:

- moderate, persistent asthma – receives allergy shots in office one to two times each month;

- steroids can case difficulty maintaining concentration;

- antihistamines can cause drowsiness;

- moderate, persistent asthma, with exacerbations that can last for three to seven days and require her to be off work for treatment.

(Tr. 1256.)  Dr. Karnani also opined that Ms. Vaughn's impairments would cause her to miss work one day or less each month.  (*Id*.)  Dr. Karnani opined that the severity of her impairments existed since at least October 2017.  (*Id*.)

### b.     State Agency Reviewing Medical Consultants

On initial review, on January 8, 2019, state agency reviewing medical consultant Gerald Klyop, M.D. opined that Ms. Vaughn had the physical RFC to:

- lift and/or carry twenty pounds occasionally and ten pounds frequently;

- stand and/or walk about six hours in an eight-hour day;

- sit about six hours in an eight-hour day;

- never climb ladders, ropes, or scaffolds;

- occasionally stoop, kneel, crouch, or crawl;

- and frequently climb ramps and stairs; and

- avoid concentrated exposure to respiratory irritants exposure.

(Tr. 138-40.)  Dr. Kylop commented that the postural limitations were due to back pain and fibromyalgia and the need to avoid respiratory irritants was due to her history of asthma.  (Tr. 139-40.)

At the reconsideration level, on March 25, 2019, state agency reviewing medical consultant Stephen Sutherland, M.D. generally reached the same opinion regarding Ms. Vaughn's physical RFC, except he found that she could occasionally rather than frequently climb ramps and stairs and she would also need to avoid unprotected heights due to combined hip / back pain and obesity.  (Tr. 177-79.)

C.  **Hearing Testimony**

1.  **Plaintiff's Testimony**

At the February 27, 2020 hearing, Ms. Vaughn testified in response to questioning by the ALJ and her counsel.  (Tr. 99-115.)  She testified to never smoking.  (Tr. 101, 112.)  She reported having three inhalers and prescriptions including Loratadine D, Prednisone, Albuterol Sulfate for use with her nebulizer, Wellbutrin, Cymbalta, gabapentin, Bentyl, Omeprazole, Imitrex, doxepin, Naproxen, and Flexeril.  (Tr. 100-02.)  She indicated that she took Prednisone for her fibromyalgia and asthma, and estimated taking it at least a few times a week, noting she could take five to ten milligrams, twice a day.  (Tr. 101-02.)  She testified to using her nebulizer at least six times during a week.  (Tr. 109.)  She also testified that her medications caused the following side-effects: dizziness, tiredness, fatigue, and sleepiness.  (Tr. 102.)

She reported not working at the time of the hearing and explained that she was let go from her office job in October 2017.  (Tr. 102-03.)  She stated that her employer told her "it just wasn't working out anymore," but she felt it was likely that she was let go because she called off a lot to attend doctor's appointments and she was not able to get up in the morning.  (Tr. 103.)

She testified that her breathing was aggravated with the change in seasons.  (Tr. 108.)  She also stated, "steps [made] [her] breathe really, really hard," that her breathing was aggravated by dust from the furnace during colder weather, and that stress made her need to use her nebulizer.  (Tr. 108-09.)

2.  **Vocational Expert's Testimony**

A Vocational Expert ("VE") testified at the hearing.  (Tr. 115-21.)  The VE classified Ms. Vaughn's past clerical work as a light exertional, semi-skilled position.  (Tr. 116-17.)  The ALJ asked the VE whether Ms. Vaughn's past work or any other jobs would be available for an

individual of the same age and with the same education and vocational background as Ms.

Vaughn with the ability to:

> lift, carry, push and pull 20 pounds occasionally and ten frequently; for this hypothetical the individual can sit for six hours, stand and/or walk for six hours in a normal workday; this person cannot climb ladders, ropes, or scaffolds and can occasionally climb ramps and stairs; this person can occasionally stoop, kneel, crouch, and crawl; this person must avoid concentrated exposure to dusts, fumes, gasses, odors, and poorly ventilated areas; this person must avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery; this person would be further limited to only simple routine tasks that do not involve arbitration, negotiation, or confrontation; this person cannot direct the work of others and cannot be responsible for the safety or welfare of others; this person cannot perform piece-rate work or assembly line work.

(Tr. 117-18.)  The VE testified that Ms. Vaughn's clerical job would not be available but there

would be other jobs in the national economy that the individual could perform, including light

assembly work, inspector, and machine tender, feeder.  (Tr. 118-19.)   The VE testified that there

would be no work available if the described individual was also off-task twenty percent of the

time on an ongoing basis, clarifying that being off-task more than ten percent of workday day

was usually considered not consistent with competitive at-will employment.  (Tr. 119-21.)  The

VE testified that missing work more than a day to a day and a half each month or eighteen days

in a year would be work preclusive.  (Tr. 120.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments

depends on the existence of a disability.  Disability is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir.

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has

the Residual Functional Capacity ("RFC") and vocational factors to perform other work

available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his March 19, 2020 decision, the ALJ made the following findings:[2]

1.  The claimant meets the insured status requirements through June 30, 2022. (Tr. 69.)

2.  The claimant has not engaged in substantial gainful activity since October 13, 2017, the alleged onset date.  (*Id.*)

3.  The claimant has the following severe impairments: obesity, degenerative disc disease of the lumbar spine, bilateral hip bursitis, migraine headaches, asthma, fibromyalgia, major depression, and unspecified anxiety disorder. (Tr. 70.)

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  (Tr. 70-72.)

5.  The claimant has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except she: may occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs, but may never climb ladders, ropes, or scaffolds; must avoid concentrated exposure to dust, fumes, gases, odors, and poor ventilation; must avoid all exposure to workplace hazards, including unprotected heights and moving mechanical parts; is limited to the performance of simple, routine tasks that do not include arbitration, negotiation, confrontation, the direction of, or conferral responsibility upon the claimant for the safety or welfare of, others, undertaken in a work setting free of piece-rate work or assembly-line work.  (Tr. 72-79.)

6.  The claimant is unable to perform any past relevant work. (Tr. 80.)

7.  The claimant was born in 1970 and was 47 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  (*Id.*)

8.  The claimant has at least a high school education and is able to communicate in English.  (*Id.*)

9.  Transferability of job skills is not material.  (*Id.*)

---

[2] The ALJ's findings are summarized.

10. Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including machine tender feeder, assembler, and inspector. (Tr. 80-81.)

Based on the foregoing, the ALJ determined that Ms. Vaughn had not been under a disability from October 13, 2017 through the date of the decision. (Tr. 81.)

## V. Plaintiff's Arguments

Ms. Vaughn argues that the ALJ failed to properly assess the opinion of her treating allergist/immunologist Ravi Karnani, M.D. (ECF Doc. 13 pp. 11-24; ECF Doc. 16.)

## VI. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)); *see also Blakley*, 581 F.3d at 406. The Commissioner's findings "as to any fact if

supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if a preponderance of evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'")(quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007), citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004)).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**     **Assignment of Error: Whether ALJ Erred in Finding Medical Opinion of Treating Allergist Ravi Karnani, M.D. Not Persuasive**

In her sole assignment of error, Ms. Vaughn challenges the ALJ's evaluation of the opinion of her treating allergy and immunology doctor Ravi Karnani, M.D.  (ECF Doc. 13 pp. 11-24; ECF Doc. 16.)  The ALJ found Dr. Karnani's opinion was not persuasive.  (Tr. 78-79.)  Ms. Vaughn challenges that determination, particularly with respect to Dr. Karnani's check box finding that Ms. Vaughn would "likely be off-task at last 20% of the time" (Tr. 1256), noting that the VE "opined that there would be no competitive employment for an individual who would be off-task 20% of a workday as opined by Dr. Karnani."  (ECF Doc. 13 p. 13 (citing Tr. 119-20).)

The Social Security Administration's ("SSA") regulations for evaluation of medical opinion evidence in claims filed after March 27, 2017 apply in this case.  20 C.F.R. § 404.1520c.  Those regulations provide that "administrative law judges will now evaluate the 'persuasiveness' of medical opinions by utilizing the five factors listed in paragraphs (c)(1) through (c)(5) of the regulation."  *Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020) (quoting *Gower v. Saul*, 2020 WL 1151069, at * 4 (W.D. Ky, March 9, 2020) (citing 20 C.F.R. § 404.1520c(a) and (b)).  The five factors are supportability, consistency, relationship with the claimant, specialization, and other factors, with supportability and consistency acknowledged to be the most important factors for consideration.  20 C.F.R. § 404.1520c(c)(1)-(5); 20 C.F.R. § 404.1520c(b)(2).  While ALJs are required to explain how consistency and supportability were considered, they "may, but are not required to, explain how [they] considered the factors in paragraphs(c)(3) through (c)(5) of this section, as appropriate, when [they] articulate how [they] consider medical opinions and prior administrative medical findings in [a claimant's] case record."  20 C.F.R. § 404.1520c(b)(2).

In support of her request for remand, Ms. Vaughn argues that the ALJ mischaracterized evidence relating to the evaluation and treatment of her asthma, including pulmonary function tests, chest x-rays, evidence regarding medication side effects, and pulse oximetry readings. (ECF Doc. 13 pp. 13-21.)  She further argues that the ALJ inadequately considered the required factors of "supportability" and "consistency" when assessing the persuasiveness of Dr. Karnani's opinion, and failed to address all of the reasons Dr. Karnani provided as bases for his opinion. (*Id*. at pp. 21-24 (citing Tr. 1256)).

In response, the Commissioner argues first that the Dr. Karnani's opinion regarding off-task behavior amounts to a disability opinion that the ALJ was not required to evaluate.  (ECF Doc. 14 p. 13.)  Next, she argues that the ALJ reasonably concluded that the opinion was not persuasive because it was not supported by the overall evidence of record, including Dr. Karnani's own notes.  (*Id*. at p. 14.)  In particular, she notes the speculative nature of Dr. Karnani's stated reasons for finding Ms. Vaughn likely to be off-task (*id.* at p. 14 (citing Tr. 78-79, 1256)), contends that the ALJ accurately described evidence of medical testing, clinical examinations, and Ms. Vaughn's denial of medication side effects to providers (*id.* at pp. 15-16 (citing records)), and points out that Ms. Vaughn has failed to identify evidence to the contrary, i.e., evidence showing she <u>did</u> complain of medication side effects to her providers (*id.* at p. 17).

The undersigned will address the arguments in turn below, beginning with the Commissioner's assertion that the ALJ was not required to evaluate the persuasiveness of Dr. Karnani's opinion because it amounts to a disability opinion.

### 1.    Whether Off-Task / Absenteeism Opinion Amounted to Disability Opinion

As an initial matter, the Commissioner argues that the ALJ was not required to evaluate Dr. Karnani's opinion as to "off-task behavior, absences, and breaks at a work-preclusive

frequency" because such opinions are "'tantamount to a disability opinion,' and should therefore

be treated the same as other issues reserved to the Commissioner." (ECF Doc. 14 p. 13 (citing

*Sims v. Comm'r of Soc. Sec*, 406 F. App'x 977, 980 n.1 (6th Cir. 2011); *Littleton v. Comm'r of*

*Soc. Sec*., No. 5:12 CV 2756, 2013 WL 6090816, at *11 (N.D. Ohio Nov. 19, 2013); *Saulic v.*

*Colvin*, No. 5:12CV2753, 2013 WL 5234243, at *9 (N.D. Ohio Sept. 16, 2013); *Chhay v. Colvin*,

No. 1:13-CV-02229, 2014 WL 4662024, at *8 (N.D. Ohio Sept. 17, 2014 and 20 C.F.R. §

404.1520b(c)(3).) Ms. Vaughn responds that Dr. Karnani's opinion "did not touch on an issue

reserved to the Commissioner," and that the questions in the form regarding off task behavior

and absenteeism "very purposefully did not ask what impact the absenteeism or off-task behavior

would have on Plaintiff's employability" because Dr. Karnani is not qualified to make that sort

of vocational judgment. (ECF Doc. 16 p. 2.)

       While the Regulations do provide that statements as to whether a claimant is "disabled"

or "able to work" are "inherently neither valuable nor persuasive," 20 C.F.R. § 404.1520b(c)(3),

the undersigned agrees with Ms. Vaughn that the questions answered by Dr. Karnani in his

medical opinion were not issues reserved to the Commissioner under this standard. Dr. Karnani

offered his opinion as to the percentage of time that Ms. Vaughn would be "off-task" (checking a

box stating that she would "likely be off-task at least 20% of the time") or absent (checking a

box stating she would be absent "About 1x a month" and writing in "or less"). (Tr. 1256.)

While a VE may offer testimony as to whether such limitations are work-preclusive, such

findings from a treating medical provider are not *per se* statements that Ms. Vaugh was

"disabled" or unable to work. *See Sharp v. Barnhart,* 152 F. App'x 503, 509-10 (6th Cir. 2005)

(finding no "regulatory or case support" for a finding that a doctor's opinion as to absenteeism

"remains an issue reserved to the Commissioner," when the opinion was based on extensive treatment by the provider).

The cases cited by the Commissioner do not require a finding to the contrary.  In *Sims*, the Sixth Circuit found on the merits that an ALJ's decision to discount a medical opinion including a finding that the plaintiff "could not work a full eight-hour shift" was "sound and supported by substantial evidence" because the opinion was based largely on subjective complaints and not supported by other medical evidence in the record, 406 F. App'x at 979-981, and suggested only in a footnote that the opinion was also "tantamount to a disability opinion" and therefore "not entitled to 'any special significance'" under the prior regulations, *id.* at 980 n.1.  The peripheral nature of the relevant language undermines any finding that an analysis of persuasiveness was unnecessary in this case, and it is further noted that *Sims* did not address off-task or absenteeism findings mirroring those at issue here.

In *Littleton*, the Magistrate Judge concluded in a report and recommendation that it was inconsistent with the regulations to treat "an opinion that an individual will miss three or more days a month" as a medical opinion because such limitations are "*per se* disabling."  2013 WL 6090816, at *11 (italics in original).  However, the District Judge declined to reach that issue, and found instead that the ALJ properly analyzed the relevant opinion under the regulations.  *Id.* at *3.  The same Magistrate Judge made similar findings in two other unpublished cases.  *See Saulic*, 2013 WL 5234243, at *9 (finding opinion that plaintiff would be absent four days per month was not a medical opinion entitled to controlling weight); *Cchay*, 2014 WL 4662024, at *8 (same).   However, he also recognized that other cases supported a finding to the contrary, *id.*, and acknowledged that opinions regarding potential absenteeism may constitute medical opinions when "not the product of conjecture," *Cchay*, 2014 WL 4662024, at *8 n. 7.

The undersigned is not persuaded that the decisions in *Littleton, Saulic*, or *Chhay* support a finding that Dr. Karnani's opinions as to off-task behavior or absenteeism were nonmedical opinions on issues reserved to the Commissioner in this case. The record reflects that Dr. Karnani was a treating provider for Ms. Vaughn during the relevant time period, and his opinion specifically states that he based his opinions as to off-task behavior and absenteeism on diagnoses and treatment modalities for which he was the treating provider. (Tr. 1256.) Notably, his opinion as to absenteeism was that Ms. Vaughn would be absent from work on average "[a]bout 1x a month *or less*" (Tr. 1256 (italics represent hand-written addition by Dr. Karnani)), a degree of absenteeism that is not necessarily inconsistent with competitive work based on the VE's testimony in this case (*see* Tr. 120 (VE testimony that absenteeism greater than "a day to a day and a half per month: 18 days end of the year, at most" would preclude "competitive at-will employment"). Clearly, a finding regarding absenteeism that does not preclude the performance of competitive work is not properly treated as an opinion that Ms. Vaughn was disabled.

While Dr. Karnani's opinion as to likely off-task behavior in excess of 20% per day would preclude competitive work according to the VE testimony in this case (Tr. 119-20), neither the record nor the applicable caselaw support a finding that this opinion was "tantamount to a disability opinion" reserved to the Commissioner. The undersigned therefore turns next to the ALJ's evaluation of Dr. Karnani's opinion and the related evidence.

### 2. Whether ALJ Mischaracterized Evidence or Failed to Adequately Address Regulatory Standards in Finding Dr. Karnani's Opinion Not Persuasive

Ms. Vaughn argues: "A review of the underlying evidence of record reveals an array of mischaracterizations, leaps of logic, and outright factual errors that permeate the decision's discussion of the medical evidence related to Plaintiff's asthma." (ECF Doc. 13 p. 11.) As a

result, she asserts that the ALJ's supportability and consistency determinations relative to Dr.

Karnani's opinion are inadequate and not supported by substantial evidence.  (*Id*. at pp. 21-24.)

In his discussion of the RFC, the ALJ summarized the evidence relating to Ms. Vaughn's

asthma as follows:

> In terms of the claimant's alleged asthma, she was diagnosed with asthma, on August 14, 2018 (B8F/7), a finding corroborated by a positive methalcholine challenge test, on November 15, 2019 (B27F/6). While these findings would be consistent with the claimant's allegations of shortness of breath and wheezing, the record, when considered as a whole, is not supportive of the contention that the existence of this impairment would be preclusive of all types of work.
>
> Pulmonary function tests, dated May 31, 2019 (B22F/7), and November 15, 2019 (B27F/6), were within normal limits.
>
> Radiographic study of the chest, dated February 21, 2017 (B4F/43), August 20, 2018 (B4F/49), and June 6, 2019 (B22F/7), all returned normal findings, without change over time.
>
> The claimant follows a regimen of multiple prescription medications intended to address these impairments, including periodic "bursts" of steroid medications, all discernibly addressed to this impairment (B2E/5), (B10E/6, 8). She has reported multiple side effects of these medications in reports to the Agency (B5E/8), (B10E/6, 8), but has consistently denied such side effects, in reports to various prescribers (B19F/35), (B5F/4), (B6F/66), (B21F/21).
>
> The claimant has not required emergent treatment, been hospitalized, or mechanically intubated for an exacerbation of this impairment, during the period relevant to this claim.
>
> Clinical examinations included in the record have consistently, albeit not universally, reported either mildly adverse, or benign findings, including one dated December 29, 2017, which reported a normal respiratory effort and normal breath sounds, with pulse oximetry of 97% on room air (B4F/6-7), one dated October 31, 2018, which reported pulse oximetry of 97% on room air, with a normal respiratory effort and no respiratory distress (B13F/5, 4), or one dated February 4, 2020, which reported pulse oximetry of 97% with a normal respiratory effort, no respiratory distress, normal breath sounds, and no wheezes or rales (B31F/5-6).

(Tr. 74-75.)

In his later discussion of the opinions of the state agency medical consultants, which he found persuasive, he made the following additional observations in support of his adoption of pulmonary-related limitations in the RFC:

> … The record shows an obese claimant, compounding the effects of ... a respiratory disorder, but one causing no abnormality to the structure (B22F/7), or function (B27F/6) of the claimant's lungs. … Clinical examinations have consistently reported normal oxygenation on room air and with no respiratory distress (B4F/6-7), (B31F/5-6), … and the claimant has retained an array of activities of daily living of sufficient breadth to encompass household chores (B22F/2), gardening (B14F/1), and walking for exercise and pleasure (B21F/21). … The pulmonary restrictions are appropriate as suggested, given the normality of chest x-rays and pulmonary function testing. The restriction against exposure to workplace hazards is appropriate as precautionary against the claimant experiencing a sudden "burst" of pain, sudden-onset headache, or dyspneic episode while working at an unguarded height or in the vicinity of inherently dangerous machinery. …

(Tr. 78.)

Finally, he provided the following discussion in support of his finding that Dr. Karnani's medical opinion was not persuasive:

> The claimant's allergist, Ravi Kamani [*sic*], M.D., indicated that the claimant would be off-task twenty or more percent of the day, would not be able to concentrate if on steroids, and "might" have side effects of antihistamines that would affect her ability to work. Dr. Ramani [*sic*] has treated the claimant on multiple occasions and is reporting within the bounds of his professional certifications and specialty. However, he has seen fit to prescribe steroids on multiple occasions, sometimes without seeing her (B21F/31), without concern for a loss of concentration. The claimant has typically denied side effects of her asthma/allergy medications (B21F/21, 15, 12). This opinion is not consistent with Dr. Kamani's [*sic*] own records. It is not consistent with, or supported by, the overall evidence of record, described above in digest form. This opinion is not persuasive.

(Tr. 78-79.)

### i. Whether ALJ Mischaracterized Evidence Regarding Pulmonary Function Testing, Chest X-Rays, or Reported Side Effects

With respect to the alleged mischaracterization of evidence, Ms. Vaughn argues first that the ALJ's discussion of her pulmonary function tests ("PFTs") "evinced a lack of appreciation

26

for how these tests reaffirmed Plaintiff's diagnosis." (ECF Doc. 13 p. 14.)  In particular, she takes issue with the ALJ's observation that PFTs in May and November of 2019 "were within normal limits." (*Id.* at p. 15 (citing Tr. 74).)  Importantly, she does not dispute that the May 2019 PFT results were "at or near normal," but points out that such results were not inconsistent with an asthma diagnosis and led her pulmonologist to order additional testing that included a "Methacholine Challenge." (*Id.* (citing Tr. 1174).)  She also does not dispute that the November 2019 results "fell within the normal range," but notes that the results included a possible co-existing restrictive ventilatory defect, mildly reduced diffusing capacity, and positive Methacholine Challenge test. (*Id.* (citing Tr. 1234).)  Based on these findings, she contends that a normal PFT test is "a red herring," and that the normal PFT findings with a positive Methacholine Challenge effectively supported the diagnosis of "asthma and not some other respiratory impairment." (*Id.* at pp. 15-16.)

In reviewing the ALJ's findings and the underlying evidence, the undersigned cannot conclude that the ALJ mischaracterized evidence regarding Ms. Vaughn's PFT findings.  His observation that the findings were within normal limits was factually correct according to both the evidence and Ms. Vaughn's own argument.  The ALJ also specifically recognized – consistent with Ms. Vaughn's argument above – that the asthma diagnosis was "corroborated by" the positive methacholine challenge test in November 2019. (Tr. 74.)  Indeed, the ALJ specifically relied on this evidence in finding asthma to be a severe impairment that necessitated the specified pulmonary limitations in the RFC.  Irrespective of Ms. Vaughn's contention that the ALJ should have found her asthma limitations to be more significant based on the PFT findings, the record clearly reflects that the ALJ did not mischaracterize those findings.

Ms. Vaugh makes a similar argument with respect to pulse oximetry readings, contending first that they are "another red herring" and have "nothing to do with the severity of Plaintiff's asthma or whether the impairment is controlled" (ECF Doc. 13 p. 19), and second that the pulse oximetry readings cited by the ALJ were taken at hospital or doctor visits that did not relate to treatment for her asthma (*id.* at pp. 20-21).  What Ms. Vaughn does <u>not</u> do is provide citations to medical records containing pulse oximetry readings that are materially different from the pulse oximetry readings cited by the ALJ.  She also does not cite to any evidence that would support a finding that the pulse oximetry readings the ALJ cited were inaccurate or not reliable.  The undersigned accordingly concludes that the record does not support a finding that the ALJ mischaracterized the evidence relating to Ms. Vaughn's pulse oximetry findings.

Ms. Vaughn also contends that "[t]he ALJ's discussion of Plaintiff's chest x-rays is inaccurate and evinced a lack of appreciation for the role x-rays play when treating asthma." (EFC Doc. 13 p. 16.)  The ALJ described chest x-rays of February 2017, August 2018, and June 2019 as "return[ing] normal findings, without change over time."  (Tr. 74.)  While Ms. Vaughn does not dispute that the February 2017 x-ray was normal, she contends that the August 2018 x-ray "was not normal as it revealed low lung volume/hypoventilation" (ECF Doc. 13 pp. 16-17 (citing Tr. 647, 1212)), and that the June 2019 x-ray results were "more nuanced than 'negative chest'" because the "x-ray revealed linear atelectasis of the right mid-lung field and biapical pleural thickening" (*id.* at p. 17 (citing Tr. 1216-17).)

A review of the report for the August 2018 x-ray reveals that the "IMPRESSION" of the reviewing physician did include "[h]ypoventilation," but also included findings of "no acute pulmonary disease" and "[n]o significant change when compared to the previous study."  (Tr. 647, 1212.)  A similar review of the underlying report for the June 2019 chest x-ray reveals that

the "INDICATION" for the x-ray was "Shortness of breath," and the "IMPRESSION" of the reviewing physician was: "Negative chest."  (Tr. 1217.)  While the more detailed written findings in the report do additionally note "linear atelectasis of the right mid-lung field" and "biapical pleural thickening" (*id.*), the reviewing physician ultimately found these findings consistent with a determination that the x-ray findings were "negative."  Indeed, Dr. Karnani described the results in his own records as "clear or normal officially" and a "[g]ood result."  (Tr. 1134-35.)

Upon reviewing the underlying evidence, the undersigned cannot conclude that the ALJ mischaracterized the evidence regarding the chest x-ray findings.  There is no dispute that the February 2017 chest x-ray was normal.  The August 2018 x-ray report findings of "no acute pulmonary disease" and "no significant change" supply substantial evidence to support the ALJ's characterization of the x-ray findings as "normal" and "without change over time," and Ms. Vaughn did not identify evidence or opinions of record suggesting that a "hypoventilation" notation is inconsistent with those characterizations.  The same is true of the "[n]egative chest" impression for the June 2019 x-ray, with no evidence or opinions of record suggesting that findings of "atelectasis" or "pleural thickening" are inconsistent with a characterization of the "negative" x-ray findings as "normal" and "without change over time," particularly given Dr. Karnani's own characterization of those findings as "clear or normal" and a "[g]ood result."

The undersigned accordingly finds that Ms. Vaughn has failed to show that the ALJ mischaracterized the evidence relating to her chest x-rays.  Indeed, Ms. Vaughn's contentions that "[a] chest x-ray will not tell a physician how severe or active their patient's asthma is" and "chest x-rays are ordered to rule out other conditions" (ECF Doc. 13 p. 13) appear consistent with the ALJ's finding that the chest x-rays were normal, given that this is a case where asthma

has been identified as the only severe respiratory impairment.  The argument certainly does not lend further credence to Ms. Vaughn's suggestion that the ALJ misconstrued the evidence.

The final alleged mischaracterization of the record challenged by Ms. Vaughn is "the ALJ's discussion of perceived inconsistencies between Plaintiff's statements regarding the side effects of her asthma medications included in Agency reports and the underlying medical evidence of record."  (ECF Doc. 13 pp. 17-19.)  In separate findings for each severe physical impairment, the ALJ highlighted the contrast between the medication side effects Ms. Vaughn reported to the SSA and her failure to report side effects to her medical providers, citing in each reference to the same combination of documents.  (*See* Tr. 74 (degenerative disc disease), Tr. 74 (asthma), Tr. 75 (hip bursitis), Tr. 76 (fibromyalgia).)  Ms. Vaughn contends that the ALJ's summary is misleading because three of four record citations do not relate to her asthma treatment, and because the ALJ mischaracterized Dr. Karnani's notes when he stated that Ms. Vaughn had "consistently denied [medication] side effects."  (ECF Doc. 13 p. 18 (citing Tr. 74).)

First, the undersigned notes that the ALJ made more specific references to Ms. Vaughn's asthma treatment records when he subsequently noted in his analysis of Dr. Karnani's medical opinion that "[t]he claimant has typically denied side effects of her asthma/allergy medications," which he supported with citations to Dr. Karnani's notes from three separate asthma treatment visits.  (Tr. 79 (citing Tr. 1141, 1144, 1150).)

Second, upon review of the underlying treatment records, the undersigned does not find support for Ms. Vaughn's contention that the ALJ mischaracterized Dr. Karnani's office notes regarding side effects.  In the notes for each of the three cited treatment visits, Dr. Karnani made the same observation: "No odd side effects."  (Tr. 1141, 1144, 1150.)  The notation was always made at the end of the patient history section, which apparently concerned Ms. Vaughn's most

current reported symptoms and treatment.  Ms. Vaughn argues that the records should be read as indicating that she was not having odd side effects from her allergy shots specifically.  (ECF Doc. 13 p. 19.)  The undersigned finds that it is not clear from a review of the records that Dr. Karnani was referring specifically to the side effects of her allergy treatments, as opposed to the side effects of her treatment modalities generally.  What is clear is that Dr. Karnani's treatment notes throughout that exhibit fail to document a single instance where Ms. Vaughn affirmatively complained of side effects from her asthma medications.  (*See* Tr. 1130-66.)  The only other reference to side effects is a note from Dr. Karnani in January 2019 indicating that Ms. Vaughn was advised of a "possible sedation side effect" if she took additional antihistamines.  (Tr. 1155.)  Based on a review of these underlying records, the undersigned finds that there was substantial evidence in the record to support the ALJ's finding that Ms. Vaughn "typically denied side effects of her asthma/allergy medications."  (Tr. 79.)  This was a reasonable interpretation of the relevant records, not a clear mischaracterization.

As discussed above, the undersigned finds with respect to each category of alleged misrepresentation that the ALJ's characterizations of the relevant evidence were accurate and supported by substantial evidence.  It is thus evident that Ms. Vaughn has not met her burden to demonstrate that the ALJ misconstrued the evidence in a way that failed to "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

### ii. Whether ALJ Adequately Considered Supportability and Consistency in Assessing the Persuasiveness of Dr. Karnani's Opinion

Ms. Vaughn's next argument is that the ALJ "inadequately considered the required factors of supportability and consistency when assigning persuasiveness" to Dr. Karnani's opinion.  (ECF Doc. 13 p. 21.)  Both the ALJ and Ms. Vaughn focus specifically on Dr. Karnani's check box response of "yes" to the question "would your patient likely be off-task at

least 20% of the time…?"  (*Id.*; Tr. 78, 1256.)  In support of that opinion, Dr. Karnani provided

the following information: (1) as to underlying impairments, he identified "moderate persistent

asthma" and in-office allergy shots once or twice per month; (2) in support of any inability to

concentrate, he noted "*if* she is on steroids – *can* cause difficulty in maintaining concentration";

(3) in support of any drowsiness, he noted "antihistamines *can* cause drowsiness"; (4) in support

of any side effects of medications, he noted "side effects of antihistamines *can* be drowsiness";

and (5) in support of any other reasons, he noted Ms. Vaughn "has moderate persistent asthma.

Exacerbations *can* last for 3-7 days each time which she would be off work for treatment."  (Tr.

1256 (emphasis added).)  He also checked a box indicating she would be off work "on average"

"[a]bout 1x a month," with the hand-written addition "or less."  (Tr. 1256.)

### a.     Supportability Analysis

Ms. Vaughn contends first that the ALJ "did not consider the required supportability

factor aside from vaguely referencing the overall evidence of record as described by the ALJ

earlier in the decision."  (ECF Doc. 13 p. 21.)  The regulations define "supportability" as

follows: "The more relevant the objective medical evidence and supporting explanations

presented by a medical source are to support his or her medical opinion(s) or prior administrative

medical finding(s), the more persuasive the medical opinions or prior administrative medical

finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).

In analyzing the supportability of Dr. Karnani's opinion, the ALJ acknowledged that "Dr.

Ramani has treated the claimant on multiple occasions and is reporting within the bounds of his

professional certifications and specialty."  (Tr. 78.)  With respect to his opinion regarding the

side effects of antihistamine medications, however, the ALJ highlighted the speculative nature of

the opinion by emphasizing that Dr. Karnani had indicated only that Ms. Vaughn "'might'"

experience "side effects of antihistamines that would affect her ability to work."  (*Id.*)  This observation is consistent with the language of the opinion itself, which states only that antihistamines "can" cause drowsiness (Tr. 1256), without any medical findings or observations regarding the specific impact on Ms. Vaughn.  In this context, the ALJ further noted that Dr. Karnani's own treatment records suggested Ms. Vaughn had denied medication side effects.  (Tr. 79 (citing Tr. 1141, 1144, 1150 (noting "No odd side effects.")).)  As discussed in Section VI.B.2.i., *supra,* the undersigned does not find this language to be a mischaracterization of the evidence.  At the least, Dr. Karnani's records reflect no affirmative evidence that Ms. Vaughn complained to Dr. Karnani of medication side effects.  (*Id.*)  The only identified treatment record that addresses a potential side effect is Dr. Karnani's warning of a "*possible* sedation side effect when taking *extra* antihistamines."  (Tr. 1155 (emphasis added).)  The undersigned finds the ALJ raised appropriate concerns regarding the supportability of this opinion regarding side effects.

With respect to the supportability of Dr. Karnani's additional opinion that steroids "can" cause concentration difficulties "if" Ms. Vaughn takes them (Tr. 1256), the ALJ's citation to treatment records from Dr. Karnani – which suggest she denied medication side effects and in any event lack affirmative evidence that she complained of side effects – continues to be relevant to the supportability analysis.  (Tr. 79 (citing Tr. 1141, 1144, 1150).)  The ALJ further noted that Dr. Karnani's records reflect that he prescribed steroids to Ms. Vaughn "on multiple occasions" without specifically noting a concern for a loss of concentration in the medical records.  (*Id.* (citing Tr. 1160).)  In other words, the ALJ noted that Dr. Karnani's records did not reflect any specific and contemporaneous concerns by Dr. Karnani regarding this potential side effect in the context of Ms. Vaughn's actual treatment.  The undersigned finds the ALJ raised appropriate concerns regarding the supportability of this additional opinion regarding side effects.

As a whole, the undersigned finds that the ALJ's discussion of and citations to Dr. Karnani's treatment records clearly reflect that he considered the supportability of Dr. Karnani's opinion in the context of both the speculative nature of the opinion findings and the lack of contemporaneous support in the treatment records themselves.  In finding Dr. Karnani's opinion to be "not persuasive," the ALJ explained that "[t]his opinion is not consistent with Dr. Kamani's [sic] own records."  (Tr. 79.)  For the reasons discussed above, the undersigned finds the ALJ's conclusion was consistent with the regulations and supported by substantial evidence.

### b.  Consistency Analysis

With respect to consistency, Ms. Vaughn contends that remand is appropriate because the ALJ's discussion of this factor "is not supported by the underlying record."  (ECF Doc. 13 p. 22.)  The regulations define "consistency" as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).

In support of her argument that the ALJ's consistency findings are not supported by the record as a whole, Ms. Vaughn first highlights medical records regarding her treatment with steroids and again suggests that the ALJ mischaracterized the evidence regarding her complaints of side effects.  (*Id.* at pp. 22-23.)  This issue has already been fully addressed above.  Ms. Vaughn next argues that the ALJ erred in focusing his analysis on medication side effects, without addressing other grounds noted by Dr. Karnani as a basis for his opinion.  (ECF Doc. 13 pp. 23-24.)  Specifically, she argues that the ALJ did not address the impact of Ms. Vaughn's "moderate persistent asthma" diagnosis, her receipt of allergy shots one to two times per month,

or the potential impact of asthma exacerbations "that can last for three to seven days, during which time she needs to be off work for treatment." (*Id.* at p. 24 (citing Tr. 1256).)

As a general matter, the undersigned notes that that the ALJ was not "required to discuss each piece of data in [his] opinion, so long as [he] consider[ed] the evidence as a whole and reach[ed] a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)).  It is further noted that the ALJ was permitted to rely on previously articulated information to support his persuasiveness determination, and was not required to rearticulate that information his opinion discussion. *Crum v. Comm'r of Soc. Sec*., 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion.") (citing *Forrest v. Comm'r of Soc. Sec*., 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding no need to require the ALJ to "spell out every fact a second time").

Based on a review of the decision as a whole, the undersigned concludes that the ALJ provided an adequate discussion of Ms. Vaughn's moderate persistent asthma, including exacerbations, to support his consistency findings.  He noted that the asthma diagnosis was corroborated by her positive methalcholine challenge test and consistent with her allegations of shortness of breath and wheezing, but found the record as a whole was not supportive of her contention that the impairment would be preclusive of all types of work.  (Tr. 74.)  He noted her largely normal testing and imagery, but also acknowledged her use of multiple prescription medications, including "periodic 'bursts' of steroid medications."  (*Id.*)  He noted that she complained to the SSA of medication side effects, but that her treatment records did not reflect

complaints of the same side effects to her medical providers.  (Tr. 74, 79.)  He noted that she had not "required emergent treatment, been hospitalized, or mechanically intubated for an exacerbation of this impairment" during the relevant time period.  (Tr. 74.)  He noted that her clinical examinations "consistently, albeit not universally, reported either mildly adverse, or benign findings."  (Tr. 75.)  He noted that her reported daily activities included self-care, care for household pets, household chores, preparation of meals, driving a car, shopping in stores, managing finances, medications, and appointments, reading, gardening, spending time with others, and taking walks for pleasure.  (Tr. 77.)  Based on his consideration of this combination of factors, the ALJ ultimately concluded that the record supported "pulmonary restrictions" (avoidance of concentrated exposure to specified pulmonary irritants) and restricted exposure to workplace hazards due in part to the danger of a "dyspneic episode while working."  (Tr. 78.)

While the ALJ did not specifically address Dr. Karnani's statements regarding Ms. Vaughn's need for monthly / bi-monthy allergy shots or her reported need to be off work for asthma exacerbations which "can" last for three to seven days (Tr. 1256), the ALJ did specifically acknowledge both Ms. Vaughn's periodic need for "bursts" of steroids and the lack of evidence that any exacerbation required emergent treatment, hospitalization, or intubation. (Tr. 74.)  Moreover, the undersigned notes that both of these factors appear directed primarily toward a potential need to be absent from work, in contrast to the 20% "off-task" finding that is the focus of Ms. Vaughn's arguments in this appeal.  It is observed in this context that Dr. Karnani specifically opined that Ms. Vaughn's need to be "absent from work" due to her impairments or treatment "[o]n the average" would be "[a]bout 1x a month *or less*."  (Tr. 1256 (italics representing hand-written addition).)  This level of absenteeism would not clearly preclude competitive work based on the testimony of the VE.  (Tr. 120.)

In finding Dr. Karnani's opinion to be "not persuasive," the ALJ concluded that the opinion "is not consistent with, or supported by, the overall evidence of record, described above in digest form."  (Tr. 79.)  For the reasons specified above, based on the undersigned's review of the ALJ decision as a whole, the undersigned finds that the ALJ's conclusion was consistent with the regulatory requirements and supported by substantial evidence.

For all of the reasons set forth above, the undersigned finds that Ms. Vaughn's sole assignment of error is without merit

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

April 11, 2022

*/s/ Amanda M. Knapp*

AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).